In re the **NORTH INDIANAPOLIS VENTURE, a Limited Partnership, Debtor.**

**Bankruptcy Nos. 2–90–00154, 31–1066231.**

United States Bankruptcy Court, S.D. Ohio, E.D.

March 22, 1990.

Thomas C. Scott, Richard K. Stoval, Thompson, Hine and Flory, Columbus, Ohio, for Lincoln Nat. Bank & Trust Co.

Kenneth R. Cookson, Carlile, Patchen, Murphy & Allison, Columbus, Ohio, for debtor.

Marilyn Shea–Stonum, Jones, Day, Reavis & Pogue, Columbus, Ohio.

Jay Alix, Southfield, Mich., for Cardinal Industries, Inc.

Charles M. Caldwell, Office of the U.S. Trustee, Columbus, Ohio.

## OPINION AND ORDER ON MOTION FOR RELIEF FROM STAY

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before the Court upon the motion filed by Lincoln National Bank and Trust Company ("Lincoln") for relief from the automatic stay. Lincoln's motion for an order excusing the state court receiver's compliance with the turnover provisions of 11 U.S.C. § 543, the debtor's application for appointment of attorney and the debtor's motion for an order authorizing its use of cash collateral are also before the Court. The motions were heard February 20, 1990, following which the Court took the matter under advisement.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding which this bankruptcy judge may hear and determine under 28 U.S.C. § 157(b)(2)(G). The following constitute findings of fact and conclusions of law.

### I. PRELIMINARY FACTS

The North Indianapolis Venture, a Limited Partnership (the "Debtor") is the owner of certain real property known as the Indianapolis Keystone Motel, d.b.a. The Knights Inn Motel (the "Motel") located in Indianapolis, Indiana. The Motel consists of 110 rooms.

On September 27, 1984, the Debtor executed a Promissory Note for the sum of $2,750,000.00 payable to Cardinal Industries Mortgage Company ("CIMC"). CIMC assigned the Promissory Note to Lincoln on October 4, 1984. The Promissory Note is due and payable October 1, 1990.

The obligations of the Debtor under the Promissory Note are secured by a Mort-

gage, Assignment of Rents and Security Agreement (the "Mortgage") dated September 27, 1984. CIMC assigned the Mortgage to Lincoln October 4, 1984. The Mortgage was initially recorded on October 4, 1984, and was re-recorded on October 16, 1984, to correct the legal description. The Mortgage grants to Lincoln a lien on the Motel and all personal property located thereon or relating thereto (collectively the "Collateral"), including but not limited to, all rental income and revenue from the Motel (the "Rents"). The security interest in the personal property was perfected by the filing of a financing statement with the county recorder.

Under the terms of the Promissory Note, the Debtor was required to make monthly payments of principal and interest. The last payment Lincoln received directly from the Debtor occurred in March, 1989, and represented the February, 1989 installment. Thereafter the Debtor was in default of its obligations. Lincoln then initiated state court proceedings to foreclose on the Motel and also sought the appointment of a state court receiver. Azars, Inc. (the "Receiver") was appointed receiver on June 22, 1989. An amended order was entered June 27th reflecting the true name of the Receiver. The Receiver took possession of the Motel on July 5, 1989, and has remained in possession since that date.

A decree of foreclosure and order of sale were entered on a default basis by the state court on October 5, 1989. A foreclosure sale was scheduled for January 10, 1990 at 10:00 a.m. On January 10, 1990, just minutes before the scheduled sale, the Debtor filed its voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.

Lincoln previously filed a motion to dismiss the Debtor's Chapter 11 petition on January 11, 1990. After an expedited hearing, the motion to dismiss was denied on January 25, 1990. At that time limited relief to initiate a new foreclosure process was granted. Lincoln's ability to continue that process, however, depends upon resolution of this relief from stay action. Lincoln now seeks relief from the automatic stay under both § 362(d)(1) and (d)(2).

## II. ISSUES

There are three issues for the Court's determination:

1. Has Lincoln shown cause for relief from the automatic stay by the Debtor's failure to provide adequate protection of Lincoln's interest in the Collateral within the meaning of 11 U.S.C. § 362(d)(1)?

2. Has Lincoln shown cause for relief from the automatic stay within the meaning of 11 U.S.C. § 362(d)(1) for lack of good faith by the Debtor in filing its petition?

3. Is Lincoln entitled to relief from the automatic stay under 11 U.S.C. § 362(d)(2) because the Debtor lacks equity in the Motel and the Motel is not necessary for an effective reorganization?

## III. DISCUSSION

A. *Adequate Protection As Cause For Relief From Stay Pursuant To 11 U.S.C. § 362(d)(1)*

█ It is unclear whether Lincoln contends that the Motel has declined in value since the filing of the Debtor's bankruptcy petition. The only evidence before the Court, however, including the testimony of Lincoln's appraiser, indicates that the Motel has not declined in value. Therefore, the Debtor has sufficiently demonstrated that Lincoln's interest in the Motel is adequately protected.

█ The Court also finds that Lincoln's interest in the Rents is adequately protected. Lincoln successfully sought the appointment of the Receiver and, thus, voluntarily consented to the latter's collection and use of the Rents. As long as the Receiver retains his control over the Rents, Lincoln cannot argue that its interest in the Rents is not adequately protected.

Accordingly, the Court will not grant relief from stay pursuant to § 362(d)(1) for lack of adequate protection.

### B. Lack of Good Faith As Cause For Relief From Stay Pursuant To 11 U.S.C. § 362(d)(1)

█ Lincoln has also alleged that the timing and manner in which the Debtor's bankruptcy petition was filed evidence bad faith and that such bad faith constitutes "cause" for relief from stay under § 362(d)(1). While a lack of good faith may constitute "cause" for relief from stay, the fact that a petition is filed minutes before a foreclosure sale does not, standing alone, establish bad faith which warrants relief from the automatic stay.

█ The Court believes that the issue of whether a Chapter 11 petition is filed in good faith is properly determined by whether the debtor has any assets, whether the debtor has an ongoing business it needs to reorganize and whether there is a reasonable probability that a confirmable plan can be proposed. *See In re Winshall Settlor's Trust*, 758 F.2d 1136 (6th Cir. 1985). Objective indicia of bad faith dealings may also be examined.

█ This Debtor clearly has assets and an ongoing business to reorganize. The reason for the last minute nature of the bankruptcy filing was explained satisfactorily in an earlier hearing before the Court. Further, the remaining factor, whether there is a reasonable probability that a confirmable plan can be proposed, should not generally be determined where the exclusivity period has not run and the Debtor has not been given a reasonable opportunity to submit a plan. This case is barely two months old and the Debtor has nearly another two months in which it has the exclusive right to submit a plan of reorganization. Unless Lincoln conclusively shows that no confirmable plan of reorganization can be proposed, this Court will not grant relief from the automatic stay in the initial stages of a Chapter 11 case for cause based upon bad faith grounds where the asset and ongoing business factors are resolved in a debtor's favor.

Lincoln has not made such a conclusive showing in this case, and therefore, the Court will not grant relief from stay pursuant to § 362(d)(1) for lack of good faith.

### C. Relief From Stay Pursuant To 11 U.S.C. § 362(d)(2) For Lack of Equity And Lack of Necessity of The Property For An Effective Reorganization

Section 362(d) of the Bankruptcy Code further provides in relevant part:

(d) On request of a party in interest ... the Court shall grant relief from the stay provided under subsection (a) of this section ...

(2) with respect to a stay of an act against property under subsection (a) of this section if—

(A) the debtor does not have equity in such property; and

(B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(2).

Lincoln purports to meet this two-part test by asserting that (1) the Debtor has no equity in the Motel since Lincoln's claim against the Debtor is greater than the fair market value of the Motel and (2) the Motel is not necessary for an effective reorganization because any plan proposed by the Debtor could not be confirmed.

The undisputed testimony of Lincoln's representative, Kent C. Litchin, established that as of the day of hearing, the Debtor owed Lincoln on the Promissory Note the principal sum of $2,716,265.95 and accrued interest of $151,849.43. Under the terms of the Promissory Note, Lincoln is also entitled to attorney's fees which Litchin estimated at $11,311.17. Adding these figures, the total claim of Lincoln against the Debtor as of February 20, 1990 is $2,879,426.33.

The testimony of the appraiser hired by Lincoln, Larry D. Meisner, was that the fair market value of the Motel is approximately $2.6 million. Meisner used an income approach and a market approach, and then utilized both of these values to arrive at his final figure.

In his income approach, Meisner initially determined an average daily room rate of $34.50 and multiplied this figure by the number of rooms in the Motel (110) and the

number of days in the year (365) to reach an annual potential gross income of $1,385,175.00. He subtracted $554,070.00 based on a 40% vacancy rate and added income from vending machines to come up with a total figure of $837,605.00 after vacancy. Meisner deducted annual expenses of $499,200.00 or slightly below 60%. These expenses included a $25,000.00 replacement reserve. These calculations resulted in a net income of $338,405.00 per year. Applying a 13% capitalization rate, Meisner found that the Motel has a fair market value of $2.6 million.

Meisner's market approach utilized both a gross income multiplier analysis and a sale price per unit basis. A gross income multiplier analysis involves dividing the gross annual income into the sale price to obtain a multiple. Meisner examined the gross income and sale price of four or five similar properties and obtained multiples ranging from 2.77 to 3.19. He multiplied the gross income of the Motel, which he had already determined to be $837,605.00 by 2.85, 3.0 and 3.10. The resulting values ranged from $2,387,000.00 to $2,596,000.00. From these, he chose a middle figure of $2.5 million, although conceivably a $2.4 million or $2.6 million value could have been chosen. From this same sales data involving the four or five properties he examined, Meisner found a sale price per unit of $20,000–23,000. Using a figure of $22,000.00 times the number of rooms in the motel (110), Meisner calculated the estimated value of the Motel to be 2.4 million. He then selected the $2.5 million figure as the Motel's fair market value under the market approach.

Comparing both the income and the market methods, Meisner concluded that the fair market value of the Motel is $2.6 million.

The Debtor disputed the $2.6 million appraised value. Robert E. Pausch, an employee of CIMC, utilized his own gross income multiplier analysis and income approach to arrive at a higher fair market value.

The gross income multiplier used by Pausch, which was a little over 3, was derived from the recent sale of another Cardinal motel located in a suburb just south of Cleveland. Pausch multiplied the budgeted gross income for 1990 found in Debtor's Exhibit C ($865,172.00) by this number to arrive at a fair market value of approximately $2.7 million.

For his income approach, Pausch purportedly took the budgeted net income for 1990 and divided that by a capitalization rate of 11.9%. This capitalization rate was also derived from the recent sale of the Cardinal motel near Cleveland. Pausch concluded that based on the income method, the Motel was worth approximately $3.2 million. The figure Pausch used for net operating income, however, was "three hundred and eighty-some thousand dollars" while Debtor's Exhibit C actually budgets a net operating income of $367,822.00. Using this figure and the same 11.9% capitalization rate, Pausch's fair market value would be approximately $3.09 million under the income approach.

■ In evaluating the opinions of Meisner and Pausch, the Court is mindful that a capitalization rate derived from several recent sales of similarly situated properties is generally more reliable than one derived from a single sale. This factor, together with the lack of precision in Pausch's analysis, leads the Court to believe that Meisner's values are more probative.

■ Even if the Court were to employ the higher net operating income found in Debtor's Exhibit C ($367,822.00), the fair market value of the Motel using Meisner's 13% capitalization rate, would still be only $2.83 million. Because Lincoln's claim against the Debtor is nearly $2.88 million the Court is satisfied that the Debtor presently has no equity in the Motel.

Lincoln offers three reasons for its proposition that there is no reasonable likelihood that the Debtor will be able to reorganize. First, Lincoln argues that because it will undoubtedly control the vote of its secured class and because its unsecured claim will constitute more than two-thirds of the total amount of all unsecured claims, there will be no impaired class which will

accept any plan proposed by the Debtor, as required by 11 U.S.C. § 1129(a)(10), without its consent. Therefore, the Debtor will not be able to proceed to confirmation under the cramdown provisions of 11 U.S.C. § 1129(b). Second, Lincoln contends that the absolute priority rule in 11 U.S.C. § 1129(b)(2)(B) mandates that Cardinal Industries, Inc.'s ("CII") interest as a general partner be cancelled if Lincoln, as an unsecured creditor, causes the unsecured class to reject the plan; and, thus, the very purpose of this reorganization fails. Third, should Lincoln elect to have its entire claim treated as secured pursuant to 11 U.S.C. § 1111(b)(2), the Debtor will be unable to propose any plan which would provide Lincoln with property having a present value equal to Lincoln's interest in the Collateral, as required by 11 U.S.C. § 1129(a)(7)(B); and, therefore any such plan would also fail to meet the fair and equitable test of § 1129(b)(2)(A).

The Court agrees that Lincoln will control the vote of its secured class. The Court is also willing to assume that Lincoln may have an unsecured claim which could be at least two-thirds of the total amount of all non-insider unsecured claims. However, there are other secured claimants or equipment lessors who will not be in the same class as Lincoln who may accept a proposed plan. And it is not established at this early date that all general unsecured claims, including Lincoln, will be in a single class. *See In re Aztec Company*, 107 B.R. 585 (Bankr.M.D.Tenn.1989). If Lincoln, as it has threatened, elects treatment of its claim under 11 U.S.C. § 1111(b), Lincoln, of course, would no longer have a claim in an unsecured class and would not control that class. Therefore, even if Lincoln continues to oppose any plan, there may be an impaired class which accepts a proposed plan.

Lincoln's second assertion again necessarily assumes its continued status as an unsecured creditor. If Lincoln should elect treatment under 11 U.S.C. 1111(b), it will not have an allowed unsecured claim. Therefore, it will not be able to force the application of 11 U.S.C. § 1129(b)(2)(B)(ii). Moreover, Lincoln assumes that the only purpose of the Debtor's reorganization is

to retain the general partner economic interest of CII, an assumption that the Court is unwilling to make. Again, it simply is too early in this case to posit such assumptions about the particular reorganization to be undertaken.

Lincoln's third assertion assumes that should it elect treatment of its claim under 11 U.S.C. § 1111(b), the Debtor will be unable to provide it with deferred cash payments equalling at least the amount of its allowed claim or the present value of its interest in the Collateral, whichever is greater. *See* 11 U.S.C. § 1129(b)(2)(A)(i)(II). Lincoln's claim as of the date of hearing was $2,879,426.55. The Court cannot determine at this time, however, what will be the amount of Lincoln's claim at the effective date of some future plan. However, for the purposes of this motion, the Court will assume a static claim and will use the fair market value of $2.6 million for the Motel as determined by Lincoln's appraiser. Under those facts, if Lincoln makes an election under § 1111(b), and rejects the plan, the Debtor's plan must provide to Lincoln a stream of payments totaling the greater of $2,879,426.55 or the present value of $2.6 million.

In order to perform the analysis under § 1129(b)(2)(A)(i)(II), it is necessary to determine an appropriate discount rate, commonly expressed as a market rate of interest for similar loans in the region. *U.S. v. Arnold*, 878 F.2d 925 (6th Cir.1989); *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir.1982). If the Court were to use 11.5%, the contract rate of interest, the monthly amount needed to amortize Lincoln's interest in the Collateral over a 30 year period would be approximately $25,000 to $26,000. No evidence was presented which would mandate use of a discount rate higher than the contract rate.

Lincoln's appraiser, Larry Meisner, calculated the average monthly net operating income of the Motel as $28,166.67. If the Debtor's proposed 1990 budget is used, average monthly net operating income should be $30,652.83. This amount is clearly sufficient to meet the $25,000 or $26,000 monthly payment required to pay the present

value of Lincoln's interest in the estate's interest in the Collateral. The only additional requirement is that the total payments under the plan be at least equal to Lincoln's allowed claim. If the Debtor makes the $25,000 or $26,000 monthly payment required to pay the present value of Lincoln's interest in the Collateral, such payments would equal Lincoln's claim of $2,879,426.55 within ten years. Thus, it is clear that the Debtor can meet this second requirement as well.

Therefore, the Court cannot conclude that any plan proposed by the Debtor will be unable to meet the fair and equitable test of § 1129(b)(2)(A) whether or not Lincoln elects treatment of its claim under § 1111(b).

## IV. CONCLUSION

Based on the foregoing, the Motion of Lincoln National Bank and Trust Company For Relief From The Automatic Stay must be, and hereby is denied. The Court shall separately issue orders forthwith on Lincoln's motion for an order excusing the state court receiver's compliance with the turnover provisions of 11 U.S.C. § 543, the Debtor's application for appointment of attorney and the Debtor's motion for an order authorizing its use of cash collateral.

IT IS SO ORDERED.